Irving H. Saypol, J.
Motion to disqualify an arbitrator and to vacate and annul the arbitration proceedings is granted. The question involves the misbehavior, at the very worst, giving rise to no more than suspicion of partiality on the part of an arbitrator towards one of the lawyers for one of the disputants, instigated by the lawyer.
De Nicola is a salesman at $25,000 a year, for Polcini’s partnership Leading Jewelry Manufacturing Co. De Nicola claiming his share of profits from sales pursuant to their disputed agreement initiated arbitration and was represented by lawyers Smith and Fiore. Unable to agree on arbitrators, the selections were made by an association including Blackwell who became chairman. He is a lawyer and of him there is no dispute that he is a gentleman of unimpeachable character and his probity is affirmed by the movants. Testimony has been taken at five hearings on December 13 and 20, 1955, and January 10, 13 and 24, 1956. The submission is near its close. Smith began as De Nicola’s advocate but at the next hearing Fiore appeared and when seen in conversation with Blackwell it appeared that they were most cordial and amiable towards each other with a *666 mutuality of former interests and friends. It is suggested and not denied that Fiore had learned that Blackwell like he, was formerly a Colonel attached to our occupation forces in Italy after World War II, although Fiore insists without contradiction that his conversation with Blackwell was solely in the arbitration rooms. From then Fiore took over the laboring oar from his partner Smith, as it is pictured in the moving affidavit by Leading’s lawyer Schwartz.
10. The claimant has been represented by Fiore, Acton, Smith & Keane, Esqs. Mr. Henry J. Smith had been conducting the trial in behalf of the claimant during the first hearing on December 13th, 1955. On the morning of the second hearing, on December 20th, 1955, as we entered the room, we found Mr. Blackwell in a private conversation with someone, who then sat down at the counsel table. When Trial Counsel for the company asked Mr. Blackwell, as Chairman, to identify the newcomer, Mr. Blackwell announced that it was Mr. Fiore, first named member of the firm representing the claimant, and that Mr. Fiore had served as a Colonel in military government in Italy during the war at the same time that Mr. Blackwell had also served in military government as a Colonel in Italy.
11. It was not clear then, or since, whether Mr. Blackwell and Mr. Fiore had known each other personally at the time. Mr. Fiore had apparently ascertained Mr. Blackwell’s military background, had come to the hearing, presented himself to Mr. Blackwell, and from that point on either' renewed or established a personal relationship with the Chairman of the Panel of Arbitrators based on their common experiences during the war, as fellow-officers in the same theatre.
12. At the second session Mr. Fiore remained only during the morning. Beginning with the third session he remained continuously and displaced his partner, Mr. Henry J. Smith, in the active conduct of the trial.
13. At the commencement of this session, and of the next two, personal reminiscences were exchanged between Mr. Fiore and Mr. Blackwell regarding the towns and cities of Italy they had been in, the officers they both knew, their experiences, and other matters of a similar nature. This was done in jocular, amiable, pleasant spirit of camaraderie, with the obvious delight of old comrades-at-arms. There came the day, at one of these sessions, when Mr. Blackwell presented a gift to Mr. Fiore of a dagger, which had been used, as he said, by highly placed fascists in Italy. Mr. Fiore commented, in accepting the gift, that the dagger was ornamental, and translated for Mr. Blackwell’s benefit the inscription in Italian on the dagger.
14. The atmosphere engendered at these sessions became warmer with each recollection, until the members of, and the attorneys for, the Leading Jewelry Manufacturing Co. could not help but feel they were somewhat at a disadvantage in view of these obviously warm relations. At the close of one of these sessions, Mr. Fiore and Mr. Blackwell walked off together, still conversing. There were quite a number of private chats between Mr. Fiore and Mr. Blackwell. There was an open reference to some gathering in January of ex-officers at which they might both meet.
Schwartz does not say precisely when, although Fiore clears up, that the dagger was passed to him by Blackwell at the fourth hearing on January 13,1956 and that nothing was complained of *667 it then nor at the succeeding hearing on January 24, 1956. Not until a week beyond the latter date was this complaint made against Blackwell and as Fiore puts it, no doubt the discomfiture over the impeaching of Leading’s witnesses at the hearing on January 24,1956, is the real or major inspiration for the charge of disqualification and demand for annulment. That event is a matter of disclosure by Fiore of conflicting balance sheets with glaring net worth discrepancies. Blackwell is silent on this motion but by now Fiore is his staunch protagonist, which adds to the complications.
Although the statute in words (Civ. Prac. Act, § 1462) authorizes the vacatur of an award, it is abundantly clear that in the presence of any doubt of the validity of the proceeding, if it may appear potentially impugned by misconduct and if the course of justice thereby abortable, the court can and should act firmly at once in order to preserve the essential integrity of the proceeding as a judicial process. The familiar standards which control the conduct of judges and for judicial proceedings apply to arbitration (Matter of Friedman, 215 App. Div. 130, 134, 135). The petitioner argues from a perspective all too complacent that disqualification follows but in two classes of cases both indicative of demonstrated wrong, either evidence of a financial interest in an award or demonstrated prejudice or misbehavior.
The thing to be avoided is not alone cause for removal. There should be no ground for suspicion. ‘‘ Every litigant is not only entitled to present his claims to an impartial judge, but to one who by no act on his part has justified a doubt as to his impartiality.” (Matter of Friedman, 215 App. Div. 130, 135, supra.) The Canons of Judicial Ethics are equally applicable (Canons 13, 33) and inveigh against any conduct indicative of friendship or favor for one side, or which reasonably may tend to awaken a suspicion of such a leaning. An exact analogy may be drawn with regard to the required performance on the part of Fiore if the problem involved a juror rather than an arbitrator (and the respective roles are comparable, 6 C. J. S., Arbitration and Award, § 104, p. 249, n. 63, citing Moshier v. Shear, 102 Ill. 169), for if the lawyer were seen in conversation with a juror, amiable or otherwise, the consequences would be no less than a prompt rebuke. Here, however, there was no one to stop it so it flourished and grew to the dagger incident.
Coming now to the question of inaction on the part of the movants from January 13, when the dagger was presented, until after January 24, the day when presumably Leading’s witnesses were confounded and impeached, subtracting it, still leaves the *668 remainder, that Fiore is now really Blackwell’s advocate, which adds to doubts of his continuing disinterestedness. Of that it may be said as in McCormick v. Walker (158 App. Div. 54, 59): “ The hardship falls upon the party who, however innocently, brought about the situation. The plaintiff, by his own act, elected to disqualify the referee and he cannot now be permitted to avoid the consequences of that act to the prejudice of his adversary. ’’
Forty-four years ago there appeared a little brochure entitled “ Letters to a Young Lawyer ” by Arthur M. Harris (West Pub. Co., 1912) with this cogent introduction: “ The economic restlessness, which expresses itself in the advocacy of revolutionary changes in general legislation, beats every day more violently against the time-worn doors of the ancient temple of the law; beneath the seat of Justice there is the increasing roar of popular discontent — a complaint in part just, in greater part but the incitement of demagoguery. ”
Counsel’s indiscretion led to the arbitrator’s injudicious conduct, which alone, even though no improper motive be attributed to him, leaves it nonetheless of questionable propriety. (Matter of Friedman, supra, p. 136, quoting Topia Min. Co. v. Warfield, 145 App. Div. 422, 423.) The opinion of Conway, J., now Chief Judge, in Matter of Lipschutz (Gutwirth) (304 N. Y. 58, 63) collates and restates familiar principles of the role of the Supreme Court as a court of equity in the arbitration field. The oath of arbitrators, we are reminded by the Chief Judge, at page 64, adjures that he “ ‘ faithfully and fairly * * * hear and examine * * * and make a just award ’ ”. If the award be tainted by partiality it will be vacated. “ Upon a showing that there is reason to believe that an arbitrator is incapable of discharging his duties in an impartial manner he may be removed. (Western Union Tel. Co. v. Belly, 295 N. Y. 395 * * *.) ”
What was said in 1912, seems at times to hold today; regardless of the source, those who are discontented should not be given further grounds to aggravate their roars about justice. Though the price be high to the petitioner, grist for critics’ mills and, above all, suspicion of wrong will be avoided.